FORD *v.* WRIGHT.[1]

ESTATES OF DECEDENTS—PURCHASE BY ADMINISTRATOR—VENDOR AND PURCHASER—CLOUD UPON TITLE.

An administrator and guardian of one of the minor heirs at law, in 1879, purchased, in his individual capacity, land belonging to the estate at a foreclosure sale. The youngest minor heir at law did not become of age until September, 1887. 2 How. Stat. § 8702, provides that all persons who are minors when their right to sue for land first accrues may bring an action at any time within five years after attaining their majority. The administrator, on May 11, 1892, contracted to convey to defendant, within 30 days, or thereabouts, a "perfect title" to the land. *Held*, that the possibility of a valid election by the heir at law to consider the administrator's holding as a trust for the heirs was a cloud upon his title sufficient to justify defendant's refusal to accept it.

---

[1] Rehearing denied November 23, 1897.

Appeal from Wayne; Carpenter, J.  Submitted February 2, 1897.  Decided September 14, 1897.

Bill by George T. Ford and Josephine Ford against Charles Wright for the specific performance of a land contract. The defendant filed an answer in the nature of a cross-bill, praying that the amount already paid on the contract be refunded.  From a decree for defendant, complainants appeal.  Affirmed.

*John Ward*, for complainants.

*George W. Radford*, for defendant.

MOORE, J.  June 27, 1895, complainants filed a bill, praying for the specific performance and foreclosure of a land contract dated May 11, 1892, which reads as follows:

"DETROIT, MICH.

"Rec'd of Charles Wright two hundred and fifty dollars ($250), part payment on sale to him of lot four, E. Trombley farm, containing twenty acres, known as the George T. Ford farm, on Woodward avenue, Greenfield township, Wayne county, Mich. We have sold said premises to said Wright, and he contracts to buy the same, on the following terms and conditions: * * * We are to furnish a Burton abstract, and execute and deliver a warranty deed conveying perfect title, in, say, thirty days from date.

"Witness our hands this May 11, 1892.
                    "GEORGE T. FORD.
                    "JOSEPHINE FORD.
                    "CHARLES WRIGHT."

Defendant interposed an answer in the nature of a cross-bill, in which he asked for a decree in his favor for the amount of the payments he had made on the contract. The bill was dismissed as to complainants, and a decree rendered in favor of defendant for the amount of his payments and interest.

The facts, so far as it is necessary to state them in disposing of the case, are as follows:  At the time the contract was signed, a payment of $250 was made.  A little

later, a payment of $1,000 was made. There is some controversy as to when the abstract was furnished. We do not deem that very material, for no complaint was made as to the matter of time when it was furnished. Upon the receipt of the abstract by Mr. Wright, it was referred to his attorney, who, after examination, pronounced the title defective. The matter was then referred to the attorney for complainants, who declared it to be good. After several conferences between the parties, the abstract of title and the written opinions prepared by the attorneys were, by agreement of the parties, submitted to Hoyt Post, a lawyer of long standing in Detroit, who rendered a written opinion in part as follows:

"I am inclined strongly to the opinion that, in accordance with well-established general principles governing trustees, such a purchase by an administrator would be voidable at the election of the heirs at law, and that the court of equity would, on a bill filed within reasonable time after the purchase by the heirs at law, decree that the administrator should hold the title as trustee for them; and this, not on the ground on which some administrator's sales have been held invalid,—viz., that an administrator, when he acts as seller, cannot become purchaser,—but on the broader ground that one who holds property as a trustee for others shall not be at liberty to deal with or to sell the trust property for his own profit, and that, as to any dealings with the same, he shall, at the election of the beneficiaries of the trust, be deemed in equity to have dealt as trustee for and on behalf of such beneficiaries. The authorities cited by Mr. Radford sustain this doctrine, and I believe it to be a salutary one.

"Here, however, it does not appear that Mr. Ford had in his hands any money belonging to the estate or to the heirs at law with which to make this purchase, and he was under no obligation, by virtue of his trust, to advance his individual means to save the estate, or to enable the heirs at law to make a profit out of the purchase. Therefore it became necessary for any of the heirs at law to refund to Mr. Ford the money paid for the purchase, if they were to be entitled to claim the purchase as one made in their behalf; and in all such cases equity requires parties who have the right at their election to treat such a purchase as made on their behalf, or as one made at the

individual risk of the nominal purchaser, to act with reasonable promptness, and does not permit them to delay and speculate on results without any risk. In this case the sale was made as long ago as 1879, or 13 years ago, and certainly, as to any of the heirs who were then of age, I do not believe any court would now set aside that sale, or decree that Mr. Ford held it as trustee for them. Their long acquiescence has deprived them of their right of election. The question is a pertinent one now, in my opinion, only as to such of the heirs at law as were minors at the time of the sale, and probably only to such of them as have reached their majority · within the past six or seven years, or perhaps even less than that. This would depend on what the court should hold to be a reasonable time within which they were bound to exercise their right of election. In matters of title to real estate, a reasonable doubt is almost as serious as a certain defect, and I cannot advise you that his title is good beyond any reasonable doubt. If I am right in my conclusions as to the law, the discrepancies of fact between the statement of the case as made in the paper of Mr. Ward and that of Mr. Radford are not very material; for, as was said in *Jewett v. Miller,* 10 N. Y. 402 (61 Am. Dec. 751): 'The rule is entirely independent of the question whether, in point of fact, any fraud has intervened. It is to avoid the necessity of any such inquiry, in which justice might be balked, that the rule takes so general a form.'"

After this opinion was received, several conferences were had, in relation to curing what two of the attorneys claimed to be defects. The testimony is conflicting as to just what occurred. We think it fairly established that Mr. Wright was anxious to have the title cleared up, and was willing to carry out the contract, while Mr. Ford thought the title sufficient, and was ready to make the deed. In October Mr. Ford did make a deed, and presented it to Mr. Wright, and asked him to go on with the contract, or else take his money back and surrender his contract. No money was in fact tendered. Mr. Wright at this time had sold a quarter interest in the land, and declined to accept the deed with the title in the condition it was, and declined to throw up the contract, but wanted the title cleared up, and a good deed. After this conference, in October, 1892, the

record does not disclose that anything further was done between the parties in relation to the contract until this bill was filed in June, 1895, but it does disclose that complainant had possession of the land, and that in the winter of 1892 and 1893 complainant cut down a number of elm trees upon the premises, which he says were not of much value, but which the defendant says were very valuable as shade and ornamental trees. Considerable heat has been engendered in the discussion of the case, but we do not discover any evidence of moral turpitude on the part of the litigants. They have each, evidently, been acting according to the advice given them.

The record discloses that in 1868 Eugenia Trombley was the owner of the land in question, and gave a mortgage upon it and three other lots. She died intestate in February, 1869, leaving a number of minor children, the youngest of whom became of age September 29, 1887. The husband of Mrs. Trombley was appointed administrator of her estate and guardian of her minor children, and continued to act as such until March, 1877, when he resigned. April 30, 1877, the complainant George T. Ford, who had married one of the daughters of Mrs. Trombley, was made administrator *de bonis non* of the estate. August 14, 1877, the owner of the mortgage commenced proceedings to foreclose it in chancery, making the administrator and all the heirs at law of Mrs. Trombley defendants. Money was borrowed, and a tender made of one-half of the amount claimed to be due on the mortgage. Mr. Ford, as administrator, filed an answer contesting the lien of the mortgage on lot 4. In October, 1877, Mr. Ford was also appointed guardian of Theodore Trombley, who was then a minor. After a contest in the foreclosure proceeding, a decree was made therein according to the prayer of the bill. The land was sold under said decree to Mr. Ford in May, 1879. There was competition at the sale, and Mr. Ford was the highest bidder. Before the sale he had arranged with his ward that he, Ford, would bid in the property, and that the ward could have a one-

third interest therein by paying Mr. Ford one-third of
what the property cost, and that the ward should have
time in which to make the payment.   No misunderstand-
ing has ever existed between Mr. Ford and his ward
growing out of the transaction.   The ward afterwards
decided he could not pay for his one-third interest, and
deeded his interest therein to Mr. Ford.   This deed was
made subsequent to October, 1892.   Mr. Ford has been in
possession of the premises from the time of the sale until
after the contract was made with Mr. Wright.   Mr. Ford,
as administrator, had not filed his account until subse-
quent to October, 1892, and did not obtain his discharge
until after this litigation was commenced.   At the time
of the sale to him, he was administrator *de bonis non* of
the estate of the mortgagor named in the mortgage in
process of foreclosure, and was also guardian of one of
the minor children entitled to a share in said estate.

We find no indication of want of good faith in Mr.
Ford, so that the question presented is a purely legal one.
Was Mr. Ford in a position to take a good title as an in-
dividual, under such circumstances?   It is claimed that,
whether he was or not, the statute of limitations has run
in his favor; counsel citing 2 How. Stat. § 8698.   This
might have been true had there been no minor children.
Belle Trombley was not of age until September 29, 1887.
2 How. Stat. § 8702, provides that, in case of disability
because of being within the age of 21 years, action
may be brought at any time within five years after
the disability is removed; so that we do not think this
claim is conclusive.   It is also claimed that, as this was a
judicial sale, Mr. Ford was not barred from becoming a
bidder; counsel saying: "The principle that a trustee
may purchase the trust property at a judicial sale brought
about by a third party, which he had no part in procur-
ing, and over which he could not have had control, is
upheld by numerous decisions of this and other courts of
this country;" citing *Allen* v. *Gillette,* 127 U. S. 589.
An examination of that case shows that the mortgage

which was foreclosed was made, not by the intestate of the administrator, who afterwards bid in the property, but was made subsequent to the creation of the trust relation, by one of the heirs of the intestate, who mortgaged her interest in the estate. It was this interest that was sold and purchased, and the court said of the case:

"The debt itself incurred by complainant constitutes no part of the liabilities of the estate which he, as executor, represents. The sale, when made, touched that estate nowhere. It did not diminish its assets in the least, nor withdraw from it any lands subject to the debts of creditors, and to the ultimate partition of the devisees and their assigns. There is nothing in the transaction, from its inception to its final consummation, that imposed upon the defendant any duty incompatible with his right as a purchaser at the sale."

In the same opinion Justice Lamar said:

"It must be conceded that, as a general rule of equity jurisprudence, a trustee or person acting in a fiduciary character for the benefit of others cannot become a purchaser at his own sale, or acquire any interest therein, without the express consent, or under a special permission, given by a court of competent jurisdiction. The cases cited by counsel for appellant abundantly support this doctrine. It applies to executors and administrators, who are not permitted to derive a personal benefit from the manner in which they transact the business or manage the assets of the estates intrusted to them, but whatever advantage is derived by them from a purchase at an undervalue is for the common benefit of the estate."

We think the rule is correctly stated in *Jewett* v. *Miller*, 10 N. Y. 402 (61 Am. Dec. 751). In this case Mr. Miller was receiver of an insolvent bank, which had a second mortgage of $10,000. On the foreclosure of the first mortgage, Miller, as an individual, bid in the property. The court say of the transaction:

"It is contended on the part of the defendant, Miller, that his case is out of the general rule which forbids a trustee to purchase on his own account the trust property, upon the ground that the sale in this case was a judicial sale, made under a decree against the trustee, and based

upon a title paramount to the title of the trustee and to the interest of the *cestuis que trust*. That this is not the rule was adjudged in the case of *Van Epps* v. *Van Epps*, 9 Paige, 237, and *Iddings* v. *Bruen*, 4 Sandf. Ch. 223, 263. It is hardly possible to state the rule of equity too broadly or too strongly. It will not permit a trustee to subject himself to the temptation which arises out of the conflict between the interest of a purchaser and the duty of a trustee. It was Miller's duty as receiver to make the property bring the largest possible price, but, as purchaser, this was not his interest. The rule is entirely independent of the question whether, in point of fact, any fraud has intervened. It is to avoid the necessity of any such inquiry, in which justice might be balked, that the rule takes so general a form. After the purchase by Miller, it follows that his *cestuis que trust* had the right either to demand a resale of the property, or to adopt his purchase as made for their benefit, subject, of course, in the latter case, to his lien for advances. *Slade* v. *Van Vechten*, 11 Paige, 21."

The reason for the rule is so clearly stated in this opinion it is not necessary to amplify upon it. Of course, if the *cestui que trust* is to get any benefit of the rule, action must be had within a reasonable time after the disability to act is removed. Whether such action has been had in this case or not, we express no opinion, as the proofs and the parties to be affected are not before us.

In the case of *Barnard* v. *Brown*, 112 Mich. 452, decided at the April term, there is a full discussion of what constitutes a marketable title. The provision in the contract that was then before us was: "So as to convey to them in fee, unincumbered, the title to the lots described in the contract;" and it was held that the requirements of that contract were met by a title based upon continued and adverse possession for a sufficient length of time. The contract before us has a provision not contained in the contract in the case of *Barnard* v. *Brown*. The provision is: "We are to furnish a Burton abstract, and execute and deliver a warranty deed conveying perfect title."

War. Vend. 760, states the rule:

114 Mich.—9.

"In the absence of an express stipulation as to the character of the title to be conveyed, a marketable title is always presumed; while the rule is fundamental that the purchaser will never be compelled to accept a doubtful title, or one which can only be settled by litigation, or where the purchase would expose him to the hazard thereof. * * * The terms of the contract of sale exercise an important influence upon the application of the rule, however, and in many instances will determine the question of title when raised. * * * A defect in a record title will, under most circumstances, furnish a defense to a purchaser, particularly where it affects the value of the property, or would interfere with its sale, and thus render it unmarketable; but there is no inflexible rule, in the absence of express stipulations, that a vendor must furnish a perfect title of record, and it has frequently been held that defects in the record or paper title may be removed by parol evidence. Where, however, the title depends upon a matter of fact which is not capable of satisfactory proof, or, if capable of that proof, is yet not so proved, the title is not marketable, and the purchaser is under no obligation to take it."

It was undoubtedly the intention of Mr. Wright, in requiring a Burton abstract and a perfect title, to insure the getting of a title that would satisfy a prospective purchaser, upon an inspection of the abstract, that the title was good. The title which was presented to him was of such a character as to justify Mr. Post in expressing the opinion that there was a reasonable doubt about it. Under the conditions shown by the record, we do not think Mr. Wright was bound to accept the title offered him.

Decree is affirmed, with costs.

LONG, C. J., GRANT and HOOKER, JJ., concurred with MOORE, J. MONTGOMERY, J., concurred in the result.